## Case No. 1,541.

### BLIGHT v. ASHLEY et al.

[Pet. C. C. 15.][1]

Circuit Court, D. New Jersey. April Term, 1808.

CONTRACTS—TENDER—EXCUSE FOR PERFORMANCE—AGENCY—DUTY OF AGENT—CONTRACT BY TWO OF THEM ASSIGNEES IN BANKRUPTCY — RECOVERY AGAINST ONE — EVIDENCE — DECLARATIONS—NOTICE TO PRODUCE — WAIVER—CONDUCT OF TRIAL.

1. The parties to a parol agreement, which by the understanding between them is to be reduced to writing, cannot escape from its obligations, by refusing to execute the written instrument, or to proceed further therewith.

[See Tilghman v. Tilghman, Case No. 14,045.]

2. Any one bound to do a particular thing, must either do it, or offer to do it, and if no objections are made, he must show he made the tender in a regular manner; but this is not necessary if the other party by his conduct dispenses with a regular tender, as by a previous refusal to accept it, &c. After an offer of performance, and a refusal of acceptance, it is not in the power of the opposite party to say, that he who made the offer would not, or could not have done what he declared himself ready to do.

[See Barker v. Parkenhorn, Case No. 993; Hepburn v. Auld, Id. 6,389; U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240.]

3. Where the defendants agreed to pay a sum of money, out of funds expected to come into their hands, they are not excused from the payment of damages, if the money did not come into their hands by their own fault.

[See Williams v. Bank of U. S., 2 Pet. (27 U. S.) 96.]

4. It is pressing too hard on agents, to say they ought to have done what those who were intrusted as principals, in the same pursuit, did not do.

5. After an agreement to pay a debt, as valid and subsisting, its legality and justice cannot be denied, without strong and substantial evidence to support such denial.

6. Where two of three assignees of a bankrupt enter into an agreement, in the absence of the third, the contract is not binding upon the absent assignee, unless he had previously given authority to make it, or subsequently recognized and acknowledged it. Aliter among partners.

7. The agreement of the assignees of a bankrupt, to give a preference to a particular creditor, is not valid, without the assent of the commissioners, and a certain portion of the creditors. In a joint action against them, the plaintiff cannot recover from any one, unless the claim against all is supported by evidence.

8. The declarations of a party on one day, as explanatory of what was said by him on another day and which was given in evidence, cannot be shown by testimony—what a party has said on one day, against his interest, cannot be explained by declarations on a subsequent day.

9. When the declarations and letters of an agent are evidence, if a party who gives a notice to produce papers, afterwards waive reading them in evidence, he may do so, and the papers are not made evidence, by the notice calling on the opposite party for them.

[See Hylton v. Brown, Case No. 6,982; Willings v. Consequa, Id. 17,767; Smith v. Coleman, Id. 13,029; Rhoades v. Selin, Id. 11,740. Contra, Wallar v. Stewart, Id. 17,109. See Wilkes v. Elliot, Id. 17,660.]

10. When the relation of principal and agent has ended, declarations of the agent made thereafter are not binding upon the principal.

[Cited in Griffin v. Jeffers, Case No. 5,817.]

[See U. S. v. A Lot of Jewelry, Case No. 15,626.]

11. An agent is the proper person to prove a fact, but his letters or declarations admitting facts are evidence of the motives or inducements of a contract with him, where the object is to prove such motion or inducements.]

[See Munns v. Dupont, Case No. 9,926; U. S. v. Barker, Id. 14,520; Vasse v. Miflin, Id. 16,895.]

12. Manner of conducting a cause, by the counsel for plaintiff and defendant.

[See note at end of case.]

This was a special action on the case [by Deborah Blight, executrix of George Blight, deceased, against Ashley, Fisher, and Bayard, assignees of Peter Blight, a bankrupt]. The declaration contained four special counts, and two general counts, for money lent, and for money had and received. The case was as follows:

George Blight, Mr. Cole and Mr. Frazier, being disposed to assist Peter Blight, after his embarrassments had commenced, and after he had made an assignment of his estate to trustees for the benefit of his creditors, lent a considerable sum of money to him to enable him to go on in business; and for securing themselves, and in order to conceal the name of Peter Blight in the business, the money was ostensibly loaned to Jacob Haylander, who it was said, gave his note for the amount, with an agreement, that the vessels and cargoes, in which the money should be invested, should be charged with the payment of these debts. The note was not produced, it being stated, that in consequence of the agreement of the 20th September, 1801, hereafter mentioned, it was given up; but of this no evidence was offered, nor indeed was any positive proof given of the loan. It appeared by letters from Peter Blight, (who after his assignment to trustees, became and was declared a bankrupt) to the defendants, his assignees, under the commission of bankruptcy, that the funds received from George Blight and the other persons before named, together with some of the trust property, had been invested in three vessels and their cargoes, to wit the Equator, the Mary, and the Manchester, in partnership with Murgatroyd and Sons, the name of Haylander being used instead of that of Peter Blight. The defendants wishing, as was proved by Moyland's deposition, to convert the contingent interest of Peter Blight into an absolute interest

in themselves, a meeting took place between Ashley and Fisher, Hayland·r, and Peter Blight, representing George Blight, on 20th September, 1801; when, after considerable discussion, an agreement was entered into, of which a memorandum in writing was made, with an intention that Mr. Rawle, the attorney of Ashley and Fisher, might put it into form, and which was read to all the parties, and approved by them. The memorandum was as follows:

"George Blight, ................Dolls. 14,000
"Haylander, ...................       2,500
"Cole, .......................        5,500
"Frazier, ....................        2,000
"Goods, (quere) ..............       10,000
                                    ─────────
                             Dolls. 34,000

"The half of the Equator and cargo, to be delivered over to the assignees; the 10,800 dollars to be paid by Haylander, in the first instance out of the Equator and cargo. The proceeds of the Equator and cargo, say Haylander's half, after paying the above, to be divided by the assignees between the four creditors above mentioned, pro rata; with the exception, that Cole's share shall be held by the assignees till his right to the 6,000 dollars shall be determined, and they to pay over to him or to retain, according to the event of said determination. Should the proceeds of the Equator and cargo, say of the half, be insufficient, the deficiency to be paid out of the first receipts from the funds in Africa, whither the assignees propose sending a vessel for the same. But Cole's share, arising from these last mentioned funds, to be retained as above. If Cole will pay the 6,000 dollars, the 5,500 dollars shall be paid in the same manner as to the other three."

The memorandum was not signed by the parties. Mr. Moyland further adds, that the consideration with the defendants for entering into the agreement, was their wish to vest the contingent interest of Peter Blight in those vessels, absolutely in them; from which they expected considerable profits; and also the agreement of Haylander, to pay them a debt of 10,800 dollars, due to Peter Blight, without insisting to offset against it, a debt due from Peter Blight to him of 5,500 dollars; and as to that sum, to come in for his dividend under the commission. That after much discussion, as to this point, it was at last acquiesced in by Haylander, and that in fact, he afterwards received only a dividend on 5,500 dollars. · No authority from George Blight to Peter Blight, to act for him at this meeting was proved, but it was evident that Peter Blight professed to act for him, and that George Blight always, afterwards, approved of the agreement, and insisted upon its execution. The agreement was accordingly prepared more formally, by Mr. Rawle, and another meeting was called to execute it, to wit on the 30th of September; but Ashley and Fisher then positively re-

fused to go on with the agreement, and in this determination they persevered, without assigning any reason for their refusal. At the time the agreement was made, and for some time afterwards, Bayard, the other defendant, was in Rhode Island, and no evidence of his having authorised his colleagues to act for him in this business was offered. At that time too, the Equator was under arrest in the district court for seamen's wages, which not being paid, she was, in October, sold by the marshal for 21,000 dollars, leaving, after paying the wages, about 17,000 dollars, one half of which was paid to Savage and Dugan, the assignees of Murgatroyd and Sons, and the other half was retained by Haylander, who purchased the vessel. From the sales of the cargo of the Equator, Haylander received a note for 10,800 dollars, which Moyland, his counsel, handed over to the defendants in December, 1801, which, he says, he understood to be in affirmance or under the contract of September 20th, 1801. The property in Africa consisted of parts of the cargoes of the Equator and Mary, which had been left in the hands of one Shute; who left Africa in 1801, with the property he had, came to the United States, was arrested here by the assignees of Murgatroyd and Sons, was found to be worth nothing, and finally he took the oath of an insolvent debtor. From the Manchester, nothing could be collected by the assignees of Murgatroyd and Sons, after her expenses, &c. were paid.

Mr. Moyland stated in his deposition, that after the return of the marshal of the sale of the Equator, the defendants, by their counsel Mr. Rawle, moved to take out the balance of the proceeds, on the ground of the contract of the 20th September. Mr. Rawle, in his deposition says, that the application was made on the ground of their general authority as assignees. It is further stated by Mr. Moyland, that on his propounding to the defendants certain interrogatories, embracing the affair of the agreement of the 20th September, they declined answering, saying that they might thereby injure the estate of the bankrupt. Some letters from Peter Blight to the defendants, written in 1802, were read, in which he speaks of that agreement; and says, that by that agreement, the defendants had procured the payment of the debts therein mentioned, to which no answer as to that point was given. It was proved, that on the 30th September, Haylander offered to return possession of the Equator and cargo to the defendants, and to do and perform all that he was by that agreement to do, but that Ashley and Fisher refused to go on with it. The declaration was founded on this agreement, which throughout is stated to have been made at Trenton, in the district of New Jersey, and in every count it is stated that Haylander agreed to transfer, assign and deliver over one half of the Equator and cargo to the defendants. The objections made to the recovery were: that no money was really

lent by George Blight, but that it was a mere cover. That nothing was finally agreed upon, on the 20th September, but mere heads, which before they could be binding, were to be put into form, and to be approved of. That there was no valid consideration for the agreement. That, if it was made as contended for, still it was altered by a subsequent agreement. That, even upon the construction of the agreement declared upon, Haylander was to retain the Equator and cargo, and to sell and pay over the proceeds thereof to the defendants; which not having done, the defendants are liable for nothing, being only obliged to pay out of proceeds and receipts. That it was not in Haylander's power to perform his part of the agreement, because, as to the Equator, she was in custody of the law, and was finally ordered to be sold, so that he could not deliver possession of her; and as to the other funds, they stood in the sole names of Murgatroyd and Sons, who had a right to retain them, unless it had appeared that they were not creditors of Peter Blight, which they contended they were. That Bayard was not bound by the agreement, not having been present when it was made, and no evidence that he had given the other assignees power to bind him, or that he had afterwards ratified these acts: and finally, that the contract not being signed was void, by the statute of frauds and perjuries of this state, where (though contrary to the fact) the declaration states the agreement to have been made.

All these points were controverted by the plaintiff's counsel; and on the last point, they insisted that there was a direct agreement to pay these debts, upon a new consideration passing to them, and not a collateral agreement to pay the debt of another. They read 3 Burrows, 1886, 2 Burrows, 1077.

The following points of evidence were decided in the course of the cause.

In their opening the defendants' counsel offered to give evidence of what one of the defendants had said at one day, as explanatory of what he had said at another day, of which the plaintiff had given evidence.

WASHINGTON, Circuit Justice. This is improper. The whole of an entire conversation may be given in evidence to explain the meaning of the parties; the testimony cannot be garbled. But what a party has said at one time, which makes against him, cannot be explained by declarations made at another time, which, possibly, were made to get rid of the effect of former declarations.

The plaintiff read many letters from Peter Blight to the defendants, giving them information respecting his affairs, and in relation to the contract of the 20th September, 1801. The defendant offered other letters from the same to the same, with a view to shew, that the contract of the 20th September was afterwards altered, or in some manner to affect that contract. This was objected to on

two grounds: First, that no letters from Peter Blight could be given in evidence, to bind the plaintiff, but on the ground of his being the agent of George Blight; but that to admit the evidence, it should appear that Peter Blight had a power to act for George Blight after the 20th September, 1801. Secondly, that upon no principle can the letters of an agent be read, if he be alive. 2 Ves. Sr. 193; 1 Esp. 375; 7 Term R. 663, 665, 668. For the defendants it was insisted, that the evidence was proper; because, if the motives which led a man to deal with an agent, and which their correspondence would prove, could only be proved by the agent himself, it would render very insecure, the situation of those who should deal with agents. A case from 3 Term R. 454, was read, to prove that the receipt of an agent is good evidence.

Second, as the plaintiff read some of the correspondence, the defendant has a right to read the whole.

Third, notice was given to the defendant to produce these letters, and this makes their evidence. 1 N. Y. Term R. 276.

BY THE COURT. There are certainly some cases, where the declarations or letters of an agent, are proper evidence; and others, where he must be examined, and his letters are not evidence, if he be alive. The distinction rests upon the principle, that the best evidence must be produced. If the object is to prove a fact, the agent is the proper person to prove it; and his evidence is better than his declarations. If his letter contains an acknowledgment of a fact, it is not as good evidence of the fact, as proof given by himself. But if the object is to prove, what were the motives or inducements for a man to contract with the agent, what were the statements made by him, his letters or conversation are proper evidence; not of the facts stated in them, but that such inducements and statements were made. They are the best evidence, because they speak for themselves, and the only point is, what did they state? Upon this principle, many letters from Peter Blight to the defendants were read, not as evidence of a single fact mentioned in them, but that they communicated certain information to the defendants, which, however, if important to be established, it would have been incumbent on the plaintiff to establish by other evidence. In this case however, there is no evidence, that Peter Blight was the agent of George Blight after the 20th September, 1801, after which period the letters offered in evidence were written, and they offered to be read to prove facts. There is in truth no evidence, that Peter Blight was an agent for George Blight, except that he appeared at the meeting of the 20th September, as such, and George Blight afterwards ratified what he did. As to the notice to produce these letters, there is certainly no principle of law, on which that circumstance would make them evidence. If the party giving the notice,

choose afterwards to waive the reading of them in evidence, he is at liberty to do so.

WASHINGTON, Circuit Justice (MORRIS, District Judge, absent), delivered the following charge to the jury.

In order to gain a full view of the merits of this case, I shall for a moment consider it as stripped of all the objections, which, in a degree, partake of form; as if the contract stated, and the contract proved, were precisely the same; as if Bayard had been present, and was bound by the articles of Ashley and Fisher; and as if the statute of frauds was out of the question. We must then enquire whether the contract was finally made on the 20th of September? Was it a valid contract? Did any thing afterwards occur on the part of Haylander or the plaintiff's testator, or otherwise, to alter or avoid it? What is the real import of that contract? Has it been performed by the defendants; and if not, what principles ought to govern, in fixing the damages to which the plaintiff is entitled?

No doubt can exist, that the contract was finally concluded on the 20th September, after a full and satisfactory disclosure by Peter Blight to his assignees, as Ashley and Fisher acknowledge, of all which it was necessary for them to know in relation to the contract. It was fairly made, it being proved that the memorandum, after it was written, was read over two or three times to the parties, and approved of by all. The intention of the parties, to turn this parol agreement into a written one, did not weaken the obligation of the parol agreement; and it was not competent to Ashley and Fisher, to escape from such obligations, by afterwards refusing to execute the written agreement when it was prepared, and to proceed further with it. As to the consideration, it was not only sufficient in law, but it was a substantial one. Haylander was to deliver possession of the Equator and her cargo to the assignees of Peter Blight, which certainly was beneficial to them as assignees, and the right of offset, desired by Haylander, to which he seems to have been entitled, was in a pecuniary point of view valuable and important. The pretence, that the contract was afterwards altered, so as to leave the possession of the property with Haylander, stands upon assertion only, no proof of the fact having been given. The conduct of Haylander, in superintending and directing the sale of the Equator by the marshal, and the terms of the sale, furnish no evidence of the fact. The previous refusal of the defendants to go on with the contract or to be bound by it, is sufficient to account for the conduct of Haylander in this respect. What then is the true construction of the agreement of 20th September? That Haylander should deliver possession of one half of the Equator and cargo to the defendants; that the debt due from Haylander

should be paid, out of the proceeds of the cargo in the first instance, and the balance be divided by the assignees, among the four specified creditors pro rata. If they should be insufficient to pay them fully, then, the balance unpaid was to be made up out of such sums as the defendants should raise out of the funds in Africa. There is no ground for the argument that Haylander was to retain possession of the property, and merely to pay over the proceeds to the defendants, in consequence of the stipulation that Haylander was to pay the 10,800 dollars: because the words are, that he is to deliver to the defendants possession of half the Equator and cargo; and therefore the plain meaning of the parties must have been, that the defendants were to retain that sum, which would have been, substantially, a payment by Haylander. What then has happened to avoid this agreement? It is said that Haylander did not and would not perform his part of it. The answer is complete; he offered to do it, and was prevented by the previous and persevering refusal of the defendants to be bound by the contract. If a man be bound to do a thing, he must either do it, or offer to do it; if no objections are made, he must show that he made the tender in a regular manner; but this is not necessary, if the other party, by his conduct, dispenses with a regular tender, by a previous refusal to accept it. It is said that he could not have performed it, when he made the offer; but who can say this? There was no physical or legal impossibility. Even 'admitting it was incumbent on Haylander to deliver possession of the Equator, freed from the restraints of the arrest, under process from the district court; still by paying off the seamen's wages, he might have released the vessel from that restraint, and have gained the possession of her. As to the other property, who can say, that he could not, and would not, have obtained all the necessary documents to establish the legal right of the defendants to half of that property? He offered to do it, and after the refusal of the defendants to accept the tender, it does not lie with them to say, that he would not have done what he offered to do.

What damages then ought you to find? It is to be recollected that the defendants were to pay so much money, not absolutely, but out of the proceeds of this property. It is true that nothing was received, but still, if their failure to receive funds, proceeded from their own fault, it is the same thing as if they had received them. How then does this point stand? As to the Equator and her cargo, they would certainly be liable for the amount received by Haylander, from the sales of the vessel, which would have gone into their hands, had they complied with and executed the contract. This is between eight and nine thousand dollars. About 5,000 dollars is also claimed on account of gold dust, part of the cargo of the Equator. But

it appears, that this was taken out of the vessel by Haylander, before she arrived at Philadelphia, and before the 20th September, 1801. The only ground on which this claim can be supported is, that, as it was part of the cargo which had gone into the hands of Haylander, he was bound by his agreement, to account for it to the defendants in the same manner as for any part of the cargo. As to the ivory and wood, it would be a proper subject of enquiry for the jury, what was the value of them, and whether the same came into the hands of Haylander. From the amount of the cargo, is to be deducted the 10,800 dollars paid by Haylander to the defendants, and which by the agreement he was bound to pay.

As to the funds on the coast of Africa, the defendants stood in the situation of agents, who were bound to use due and reasonable diligence to possess themselves of those funds. We find that Savage and Dugan, who were personally interested in half of that property, sent a vessel to the coast of Africa as early as January 1802, yet they could collect nothing. It would seem to be pressing too hard upon an agent, to say the defendants were guilty of negligence in not sending earlier, or that if they had done so, they would have been more successful than Savage and Dugan: of this the jury will judge. As to the Manchester, you have heard from Mr. Ingraham, who claimed the whole of her under the Murgatroyds, that nothing could be got.

But an objection is made, going to the root of this action; that nothing was ever, in fact, lent by George Blight to Peter Blight, and that the whole was a cover. It is true that the note given by Haylander has not been produced, nor has any evidence been given of it; nor has any evidence been given, that if the money was lent, a lien on this property was given, when such loan was made. But I think, after the agreement of the defendants to pay the debt as a valid and subsisting one, it is going too far to permit them to deny the fact, without supporting that denial, by strong and satisfactory evidence. Nothing of this kind has been offered.

Thus then the case would stand upon its merits; but a legal objection has been made to the plaintiff's right to recover, which remains to be considered. It is admitted that Mr. Bayard was not present on the 20th September, when the agreement was made, nor for some time afterwards. There is no proof that he ever authorised Ashley and Fisher to bind him or the estate, without his concurrence; and I think the principle of law is clear, that without such authority, previously given, or afterwards acknowledged or recognised, they could not bind him individually, or in his representative character. It is true that a co-partner may bind his associates, in relation to the partnership concerns, because each partner is interested in his share of the partnership effects and concerns, and also in the whole. But this principle does not apply to persons acting under a delegated authority, and more especially when the act is not within the scope of their authority. It is the duty of the assignees to make a legal distribution, among all the creditors. Here was an agreement to give a preference to certain creditors. If it was a case, where the law would have given the preference, it was nugatory. If the law does not sanction it, then the assignees could not give it, so as to affect the estate, without the assent of the commissioners, and a certain proportion of the creditors. Without this authority, they can neither arbitrate, nor compromise. The agreement could not therefore be binding on the defendants or either of them, in their representative characters; and certainly if they are individually bound, Ashley and Fisher could not make an agreement to bind Bayard. Should judgment be given for the plaintiff, it must be against the defendants in their individual capacities. Unless then, Ashley and Fisher were authorised by Bayard to bind him, or unless he afterwards ratified what they had done, he is not answerable to the plaintiff; and as the action is joint, the plaintiff cannot recover at all, unless she can support her action against all. But it is insisted that Bayard has subsequently ratified the agreement of the 20th September, and certain acts of his, are relied upon to prove it. Let this be considered.

The first circumstance relied on is, the claim of the defendants, (as stated by Mr. Moyland) to the balance of the proceeds of the Equator, under the contract of the 20th September. From his testimony, it would appear, as if the application was made by all the defendants; but no evidence is given that Bayard was present, and no reliance is to be placed on the expression used by the witness, because in the same deposition he uses the same language, though he admits that at the time Mr. Bayard was not present. He says, that the application to the court was made under the contract of the 20th September. This is expressly contradicted by Mr. Rawle, who made the application; who states that he made it, in virtue of the defendants' general rights, as assignees of Peter Blight. It is more likely that the person who made the motion, should know what he meant, and what he said, than any other person. Besides, is it probable, that after a positive refusal, on the 30th September, to be bound by the agreement, Ashley and Fisher, and particularly Bayard, should indirectly mean to do any thing in affirmance of that agreement?

The second circumstance is, the refusal of the defendants to answer interrogatories touching that agreement. It is impossible to say what they refused; but it is very likely that they may have entertained the incorrect opinion, which has been attempted to be supported by the plaintiff's counsel, that the agreement of Ashley and Fisher

was binding on Bayard and on the estate.

Under this idea they might well refuse to answer the interrogatories, without thereby implying that Bayard had ratified or intended to ratify the acts of his associates. Here too the observation made before applies; they could not mean, impliedly, to affirm, what two of the parties had, expressly, disaffirmed.

The third circumstance is, the payment of the 10,800 dollars by Mr. Moyland, in behalf of Haylander, to the defendants, which he says he understood to be in affirmance of the contract. If the witness had stated that it had been so declared, the evidence would have been very material; not being so declared, it amounted to nothing, although at the time he, secretly, so intended it. The payment and receipt of this money, if made without any such declaration, was entirely equivocal. The defendants, on the 20th September, claimed a right to this money, and denied the right of offset asserted by Haylander. Having declared, positively, that they would not complete or be bound by that contract, the presumption is, that they did not receive the payment under the contract. At the same time, they might have received it under the contract, but then it would be necessary, in order to justify this presumption, to prove, either that they had withdrawn their objections to go on with the agreement, or that the payment was distinctly made under the agreement. The different letters which have been relied on, from the defendants to Peter Blight, and his to them, in which he speaks of this agreement, might be material, if a peremptory refusal to be bound by the agreement had not been previously made and no evidence of a change of sentiment proved. But after this refusal, there is no room left for presumption.

Upon the whole, as there is some contrariety in the testimony, and much must depend upon a proper weighing of the evidence as to this fact, you will decide whether any thing was done by Bayard to affirm or ratify the agreement of the 20th September. If nothing was done, your verdict must be for the defendants; if otherwise, for the plaintiff.

Verdict for defendants.

NOTE [from original report]. In this case the court adopted the practice of the circuit court of Pennsylvania, as to the manner of conducting the cause; by requiring a strict opening on the part of the plaintiff and defendant,—a summing up by one of the plaintiff's counsel—then by all the defendants' counsel, and then closing by the remaining counsel for the plaintiff.

[NOTE. For subsequent proceedings to punish the plaintiff for contempt, see Blight v. Ashley, Case No. 1,542.]